IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| ROY E. WYATT, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. RDB-10-2584 |
| MARYLAND INSTITUTE d/b/a MARYLAND INSTITUTE COLLEGE OF ART, | * | |
| | * | |
| Defendant. | | |

\* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

On September 20, 2010, Plaintiff Roy E. Wyatt ("Plaintiff" or "Wyatt") filed the present action against the Maryland Institute College of Art ("Defendant" or "MICA") alleging in a one count complaint disability discrimination for wrongful termination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* amended by the ADA Amendments Act of 2008. Specifically, Plaintiff alleges that despite knowing of his glaucoma, which restricted him in his ability to see and drive at nighttime, Defendant discriminated against him by failing to accommodate his disability and terminated his employment as an Institutional Security Officer/Dispatcher due to his inability to work his nighttime overtime shifts on account of his disability. As a result, Plaintiff seeks damages in the form of back wages, interest on back pay, attorney's fees and costs as well as compensatory and punitive damages.

1

Pending before this Court is Defendant Maryland Institute College of Art's Motion for Summary Judgment (ECF No. 14). The parties' submissions have been reviewed and no hearing is necessary. *See* Local Rule 105.6 (D. Md. 2011). For the reasons that follow, the Defendant's Motion for Summary Judgment (ECF No. 14) is GRANTED.

<u>BACKGROUND</u>

The Maryland Institute College of Art ("Defendant" or "MICA") is an educational institution located in Baltimore, Maryland. Pl.'s Compl. at ¶ 2, ECF No. 1. Plaintiff Roy E. Wyatt ("Plaintiff" or "Wyatt") was employed in the MICA Department of Campus Safety from 2001 until his termination on September 26, 2007. *Id.* at ¶¶ 8-22; *see also* Termination Letter, Def.'s Mot for Summ. J., Ex. 2F, ECF No. 14-9 [hereinafter Def.'s MSJ]. This Court reviews the facts relating to his claim in the light most favorable to the plaintiff. *See, e.g., Ibarra v. United States*, 120 F.3d 472, 474 (4th Cir. 1997).

Wyatt began his employment with the Maryland Institute College of Art ("MICA") in 2001 as a security officer/building guard. Pl.'s Mem. in Resp. to Def.'s Mot. for Summ. J. at 9, ECF No. 16 [hereinafter Pl.'s Resp.]. It was at this time that MICA first learned about his glaucoma. Pl.'s Compl. at ¶ 9. In 2002, Wyatt was promoted to the position of Institutional Security Officer/Dispatcher ("ISO/Dispatcher") which involved the monitoring and dispatching of patrol officers and student workers. Pl.'s Resp. at 9. Later, in April 2004, Wyatt allegedly suffered a "worsening of his glaucoma such that he was unable to drive at night." Pl.'s Compl. at ¶ 10. Upon receiving notice of the change in his condition, MICA

allegedly modified his work schedule by permanently scheduling him for the 7:00 a.m. - 3:00 p.m. shift instead of his usual 2:00 p.m. - 10:00 p.m. shift.  Pl.'s Resp. at 9.

Following the termination of another ISO/Dispatcher in March of 2007, Wyatt claims that MICA required all security personnel to work mandatory overtime shifts to cover the 11:00 p.m. - 7:00 a.m. timeslot until the position was again filed.  Pl.'s Compl. at ¶ 11.  At that time, Wyatt allegedly advised both the Assistant Director of the Department of Campus Security, David Butkiewicz ("Butkiewicz"), and the Director of Human Resources, Betty Enselein ("Enselein"), that his condition prohibited him from working this overtime shift. *Id.* at ¶¶ 12-13.  Wyatt then claims that Enselein required him to obtain an examination of his condition at the Wilmer Eye Clinic.  *Id.* at ¶ 13.  Accordingly, Wyatt met with Dr. David Friedman who reviewed his medical records and confirmed that he suffered from glaucoma and was not to drive at night.  *Id.* at ¶ 14.  Once his diagnosis was confirmed, Wyatt claims that Enselein directed him not to drive any of the MICA vehicles at night.  Pl.'s Resp. at 13. Additionally, he alleges that Enselein agreed to send a patrol car or van transport to bring him to and from his overtime shift or, in the alternative, to limit his work schedule to daytime shifts.  Pl.'s Compl. at ¶ 15.  Wyatt also acknowledges receiving a letter from Enselein dated May 25, 2007 in which MICA agrees to "work with [him] on scheduling, including mandatory overtime when transportation is not otherwise available and possible for [him] at night."[1]  Letter, Pl.'s Resp., Ex. 9, ECF No. 25.  However, Wyatt claims that

---

[1] In addition, Wyatt alleges that an issue of material fact exists with respect to a "fabricated" May 25, 2007 letter produced by MICA in response to the Equal Employment Opportunity Commission's ("EEOC") investigation into his claim.  *See* 'Fabricated' Letter, Pl.'s Resp. at 18-19 and Letter, Pl.'s Resp., Ex. 16, ECF No. 32.  He claims that the letter was "entirely different in content" and that it was issued in an effort to

these accommodations were never made and that he was nevertheless required to work his overtime shifts.  Pl.'s Compl. at ¶ 16.

From May to August 2007, Wyatt asserts that in order to comply with this requirement, he exchanged shifts with or paid other security officers to work his assigned overtime shifts.  *Id.* at 17.  On two separate occasions during that period of time, however, he acknowledges that he was unable to find a substitute to work his overtime shift.  Pl.'s Resp. at 15.  Wyatt then claims that when he notified Butkiewicz of his inability to work those shifts, Butkiewicz threatened him with termination.  *Id.*  Wyatt then allegedly contacted the Vice President of Operations at MICA, Michael Molla ("Molla"), who in turn advised Butkiewicz that Wyatt was not required to work those shifts.  *Id.*

In September of 2007, upon learning that he was scheduled to work five overtime shifts between September 16 and October 1, 2007, Wyatt alleges that he again informed Butkiewicz that he could not comply with this requirement.  *Id.* at 16; *see also* Pl.'s Compl. at ¶ 19.  Specifically, Wyatt claims that he told Butkiewicz that he could not work the September 22 and 23 overtime shifts and that Butkiewicz again refused to accommodate his request.  Pl.'s Resp. at 16.  Additionally, Wyatt discusses a series of emails between Molla, Butkiewicz and Enselein in which alternative modes of transportation were discussed such as the Mass Transit Administration ("MTA") program or the city bus No. 14.  *Id.* at 16-17.  In

---

mislead the EEOC.  Pl.'s Resp. at 18.  However, MICA has noted that the copy produced to the EEOC was an earlier draft of the letter Wyatt received and that it was initially produced to the EEOC by mistake.  Def.'s Reply in Supp. of Summ. J. at 12, ECF No. 34.  Moreover, a review of both letters reveals that they are essentially similar in content and reflect MICA's agreement to accommodate Wyatt's glaucoma to the extent possible.  These letters do not create a genuine issue of material fact which would be dispositive of this case.  *See* further discussion *infra* at 24-25.

one of these emails, Butkiewicz allegedly stated that Wyatt had refused to take a bus to work and that he had been warned that disciplinary measures would be taken against him should he fail to attend his September 22 and 23 shifts.  *Id.* at 18; *see also* Email, Pl.'s Resp., Ex. 14, ECF No. 30.  Moreover, Wyatt appears to allege that he first learned of the MTA program through a letter from Molla dated September 18, 2007, four days before the scheduled overtime shifts in question.  Pl.'s Resp. at 18.

On September 22 and 23, 2007, Wyatt was not present during his scheduled overtime shifts.  *Id.*; *see also* Pl.'s Compl. at ¶¶ 20, 22.[2]  A couple of days later, on September 26, 2007 his employment with MICA was terminated due to his absence for the two aforementioned shifts and his unwillingness to work future overtime shifts.  *Id.*; *see also* Termination Letter, Def.'s MSJ, Ex. 2F, ECF No. 14-9.

Believing that he had been discriminated against and terminated because of his disability, Wyatt filed a timely charge of discrimination with the Baltimore, Maryland Field Office of the Equal Employment Opportunity Commission ("EEOC") on December 19, 2007.  Pl.'s Compl. at 2 & ¶ 29.  After rejecting his claims, the EEOC issued him a Notice of Right to sue letter on July 14, 2010.  *Id.*  He then filed the Complaint in this case against MICA alleging one count of disability discrimination in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.* amended by the ADA Amendments Act of 2008.  Pl.'s Compl., ECF No. 1.  In the Complaint, Wyatt claims that he has an actual

---

[2] Plaintiff's Complaint alleges that Wyatt did not report to work for the September 25, 2007 shift.  However, Plaintiff's Response in Opposition to Defendant's Motion for Summary Judgment as well as the transcripts and exhibits referred to herein indicate that Plaintiff was terminated due to his failure to appear during his September 22 and 23, 2007 overtime shifts.  *See also* Termination Letter, Def.'s MSJ, Ex. 2F, ECF No. 14-9.

disability which affects his major life activity of seeing and that MICA regarded him as disabled.[3]   *Id.* at ¶¶ 25-26.   He further alleges that although he requested several accommodations, MICA failed to accommodate his disability and that his disability was the reason for his termination.  *Id.* at ¶¶ 27-28.[4]

## STANDARD OF REVIEW

Rule 56 of the Federal Rules of Civil Procedure provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).  A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A genuine issue over a material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*  In considering a motion for summary judgment, this Court's function is limited to determining whether sufficient evidence exists on a claimed factual dispute to warrant submission of the matter to a jury for resolution at trial.  *Id.* at 249.

In undertaking this inquiry, this Court must consider the facts and all reasonable inferences in the light most favorable to the nonmoving party.  *Scott v. Harris*, 550 U.S. 372, 378 (2007).  However, this Court must also abide by its affirmative obligation to prevent factually unsupported claims and defenses from going to trial.  *Drewitt v. Pratt*, 999 F.2d 774,

---

[3] Although Wyatt claims that MICA regarded him as disabled, he fails to make any showing of proof relevant to that claim.  As such, this Court will disregard this allegation.

[4] Plaintiff's Complaint also alleges that he suffered emotional distress because of his fear of losing his employment and that he was examined by a doctor at the Veteran's Administration in Glen Burnie, Maryland concerning this condition.  Pl.'s Compl. at ¶ 21.  Wyatt fails to provide any further evidence or documentation in support of this claim.

778-79 (4th Cir. 1993).   If the evidence presented by the nonmoving party is merely colorable, or is not significantly probative, summary judgment must be granted.  *Anderson*, 477 U.S. at 249-50.  On the other hand, a party opposing summary judgment must "do more than simply show that there is some metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986); *see also In re Apex Express Corp.*, 190 F.3d 624, 633 (4th Cir. 1999).  This Court has previously explained that a "party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences."  *Shin v. Shalala,* 166 F. Supp. 2d 373, 375 (D. Md. 2001) (citations omitted).

<u>ANALYSIS</u>

Defendant Maryland Institute College of Art ("MICA") contends that it did not discriminate against Wyatt on the basis of his disability and that summary judgment should be entered in its favor.  Specifically, MICA argues that: (1) Wyatt is not disabled within the meaning of the Americans with Disabilities Act ("ADA"), (2) he was not a qualified individual with a disability under the Act and (3) he was not terminated because of his condition but because he failed to meet MICA's legitimate expectations and deliberately violated MICA's policies.

The Americans with Disabilities Act ("ADA") prohibits discrimination by a covered entity, including a private employer such as MICA, "against a qualified individual" with a disability particularly in the context of "hiring, advancement, or discharge" of an employee. *See* 42 U.S.C. §§ 12111(2), 12112(a).  To survive a motion for summary judgment, a plaintiff asserting wrongful discharge on the basis of disability discrimination must demonstrate that

(1) he was discharged, (2) he was a qualified individual with a disability under the ADA, (3) his performance at the time of the discharge met the legitimate expectations of his employer, and (4) "his discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination."  *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001). As it is undisputed that Wyatt was discharged, this Court proceeds with an inquiry into the remaining factors of this analysis.

## I.   Whether Wyatt is a Qualified Individual with a Disability under the ADA

A qualified individual with a disability is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds . . ."  42 U.S.C. § 12111(8).  Wyatt must therefore demonstrate that he is both disabled and qualified.

### a.  Whether Wyatt is disabled under the ADA

The Americans with Disabilities Act ("ADA") defines actual "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  42 U.S.C. § 12102(1); *see also Boitnott v. Corning Inc.*, __ F.3d __, Case No. 10-1769, 2012 WL 414662 (4th Cir. Feb. 10, 2012).  "The determination of whether a person is disabled is an individualized inquiry, particular to the facts of each case." *E.E.O.C. v. Sara Lee Corp.,* 237 F.3d 349, 352 (2nd Cir. 2001); *see also Taylor v. Federal Express Corp.*, 429 F.3d 461 (4th Cir. 2005).  The general definition of a major life activity includes

the activities of seeing and working among others. [5]   42 U.S.C. § 12102(2)(A).   To be substantially limited,[6] the Equal Employment Opportunity Commission ("EEOC") has stated that the employee must either be "[u]nable to perform a major life activity that the average person in the general population can perform" or "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity."  29 C.F.R. § 1630.2(j)(i). "Among the factors courts should consider in making the substantial limitation determination are the impairment's 'nature and severity' and 'expected duration.' "  *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 257 (4th Cir. 2006)(quoting 29 C.F.R. § 1630.2(j)(2)(i)-(ii)).   The Supreme Court has noted that "mitigating measures must be taken into account in judging whether an individual possesses a disability . . . [including] measures undertaken with artificial aids, like medications and devices and measures undertaken, whether consciously or not, with the body's own systems."  *Albertson's, Inc. v. Kirkinburg*, 527 U.S. 555, 565-66 (1999).

   1.  *Major Life Activity of Working*

      Although Wyatt argues that he is substantially limited in the major life activity of

---

[5] "[M]ajor life activities include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." 42 U.S.C. § 12101(2)(a)(1).

[6] In the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, 3553-55 (2008), Congress rejected the limiting interpretation of the term "substantially limits" in *Sutton v United Air Lines, Inc.*, 527 U.S. 471 (1999) and *Toyota Motor Manufacturing, Kentucky, Inc. v. William*, 534 U.S. 184 (2002) in favor of a broader view as embodied in *School Board of Nassau County v. Arline*, 480 U.S. 273, 281 (1987) (holding that a person's ability to work can be substantially limited by the negative reactions of others to an impairment.).

seeing, this dispute clearly revolves around Wyatt's inability to be present during his nighttime overtime shifts scheduled by MICA.  An individual is substantially limited in the major life activity of working, if the impairment precludes him "from more than one type of job, a specialized job, or a particular job of choice." *Taylor v. Fed. Express Corp.*, 429 F.3d 461, 464 (4th Cir. 2005) (*quoting Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 492 (1999)).  In a recent opinion, the United States Court of Appeals for the Fourth Circuit held in agreement with "all circuit courts which have addressed this issue, . . . that an employee under the ADA is not 'substantially' limited if he or she can handle a forty hour work week but is incapable of performing overtime due to an impairment." *Boitnott v. Corning Inc.*, __ F.3d __, Case No. 10-1769, 2012 WL 414662 (4th Cir. Feb. 10, 2012).  Moreover, upon reviewing the record in the light most favorable to the plaintiff, the Fourth Circuit found no evidence that his "inability to work overtime significantly restricted his ability to perform a class of jobs or a broad range of jobs in various classes." *Id.*

In this case, the record indicates that Wyatt acknowledged that he could perform at least forty hour work-weeks.  *See e.g.* Wyatt Dep. at 9-10, 23-24, Def.'s MSJ, Ex. 1, ECF No. 14-2 [hereinafter Wyatt Dep.].  Not only did he routinely work his daytime shifts while employed at MICA, but since his termination, he also has held other security guard positions requiring him to work at least forty hours a week.  *See e.g.* Pl.'s Resp. at 13, 22-26, ECF No. 16; Wyatt Dep. at 11-13, 22-25.  Nothing in the record indicates that Wyatt could not perform his duties during his overtime shift upon reporting for duty.  However, Wyatt has alleged that he could not report to his overtime shifts because of his inability to drive at

10

night.  *See* Pl.'s Compl. at ¶ 12, ECF No. 1; Pl.'s Resp. at 13.   Nevertheless, he has also acknowledged that he continues to drive at nighttime for professional and personal purposes.  Wyatt Dep. at 9-13, 50; *see generally* Wyatt Aff., Pl.'s Resp., Ex. 1, ECF No. 17 [hereinafter Wyatt Aff.].  It also does not appear that his inability to work overtime for MICA significantly restricted his prospects in terms of security guard positions or concerning other broad ranges of work.  As such and given the recent Fourth Circuit holding in *Boitnott*, Wyatt is not substantially limited in the major life activity of working under the Americans with Disabilities Act.

### 2. *Major Life Activity of Seeing*

Nevertheless, Wyatt argues that he is substantially limited in the major life activity of seeing and is therefore disabled within the meaning of the ADA.   Whether glaucoma constitutes a substantial limitation on the major life activity of seeing is an issue of first impression in this Circuit.  This Court will, therefore, consider the severity and expected duration of this condition in making the determination in this case.  *Heiko v. Colombo Savings Bank, F.S.B.*, 434 F.3d 249, 257 (4th Cir. 2006).

On the one hand, "[t]he major life activity of seeing . . . is always substantially limited by blindness."  *Heiko*, 434 F.3d at 256.  The Supreme Court has also acknowledged that "people with monocular vision 'ordinarily' will meet the Act's definition of disability." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 567 (1999).  On the other hand, however, the Supreme Court has indicated that "monocular individuals, like others claiming the Act's protection, [must] prove disability by offering evidence that the extent of the limitation in

terms of their own experience, as in loss of depth perception and visual field, is substantial."
*Id.* Additionally, a court must take "an individual's ability to compensate for the impairment" into account when making a determination as to its impact on the major life activity of seeing. *Foore v. City of Richmond, Va*, 6 Fed. Appx. 148, 152 (4th Cir. 2001) (citing *Albertson's*, 527 U.S. at 565).

In *Foore*, the Fourth Circuit held that where a police officer with monocular vision still had a driver's license, could engage in other professional activities, and could read, he was not substantially limited in the major life activity of seeing. *See Foore*, 6 Fed. Appx. at 152. Similarly, in *Perry v. Kappos*, the United States Court for the Eastern District of Virginia determined that a plaintiff's major life activity of seeing was not substantially limited by taking into account plaintiff's (a) possession of a driver's license, (b) ability to drive to and from the metro for his commute, (c) ability to drive certain short, familiar and well-lit routes, (d) ability to read documents in small type "with the aid of magnifying glasses and straight-edge-type devices," and (e) plaintiff's own admission that he can perform office work involving sitting in front of a computer work station. 776 F. Supp. 2d 182, 189-90 (E. D. Va. 2011). Other federal courts have held that where a visual impairment could "be corrected to a reasonable visual acuity level . . . nearsightedness, blindness in one eye, glaucoma, double and sometimes triple vision, night blindness, dry and painful eyes, and blurred vision [did] not amount to a disability under the ADA." *Ellis v. McHugh*, KEK-09-1976, 2011 WL 1344550 at *5 (M. D. Pa. March 18, 2011) (citing *inter alia Mondaine v. American Drug Stores, Inc.*, 408 F. Supp. 2d 1169, 1200 (D. Kan. 2006) (finding evidence of a

glaucoma diagnosis and of a plaintiff's inability to drive at night linked to glaucoma insufficient to demonstrate a substantial limitation on the major life activity of seeing given the fact that plaintiff still occasionally drove at night, was able to complete a forty hour work week and did not demonstrate any "specific difficulty related to her disability.")). The United States District Court for the Northern District of Ohio has also required "evidence of significant limitations resulting from the glaucoma" in order to make a determination that an individual suffering from glaucoma was disabled under the ADA. *Kaufmann v. Ohio Edison Co.*, VKA-09-2517, 2010 WL 5463819 at * 4 (N. D. Oh. Dec. 13, 2010).

Wyatt's deposition testimony as well as his recent affidavit, with new details concerning the progression of his disease, demonstrate that despite his glaucoma, Wyatt still drives a car during the day and at night for his personal and professional use. *See generally* Wyatt Dep. at 7-13, 25, 40-41, 50-51; Wyatt Aff. at ¶ 5-8. He also regularly drives short, familiar and well-lit routes. Wyatt Aff. at ¶ 5-7. In addition, Wyatt continues to hold a valid Maryland Driver's License which only requires him to wear corrective lenses and have mirrors on each side of the car. Wyatt Dep. 7-8, 25. Moreover, Wyatt is still capable of performing his duties as a security guard and has been so employed with other companies since his termination from MICA. *See* Wyatt Dep. 9-13, 22-26. Wyatt even indicates that while working at MICA, he could compensate for his poor vision by adjusting the size and definition of his office computer. Wyatt Aff. at ¶ 8. Additionally, Wyatt has stated that he has no problem caring for himself or engaging in other major life activities. Wyatt Dep. at 24. While Wyatt has acknowledged that he has difficulties reading and writing, he also states

that he chose his occupation based on the limited amount of reading and writing required and explains that as an ISO/Dispatcher for MICA he was able to alter his computer settings to fit his vision restrictions.[7]  Wyatt Aff. at ¶ 8.  Finally, the medical evidence included in the record only indicates that Wyatt suffers from glaucoma and that he was directed by his doctor not to operate a vehicle at nighttime.  *See* Dr. Andrew Doyle Letter, Def.'s MSJ, Ex. 3A, ECF No. 14-11 and Dr. Friedman Report, Pl.'s Resp., Ex 8, ECF No. 34).

Although there is a potential for his glaucoma to substantially impair his major life activity of seeing in the future, because Wyatt (a) has the use of both of his eyes, (b) continues to drive during the day and at night, (c) is able to read and write, albeit slowly, (d) is able to use a computer after altering its definition and font-size settings, and (e)continues to care for himself in terms of his seeing ability to the same extent as "an average person in the general population," 29 C.F.R. § 1630.2(j)(i), he is not substantially limited in the major life activity of seeing.  Consequently, because Wyatt is neither substantially limited in the major life activities of working and seeing, or any other major life activities for that matter, he has not met the requirement for an actual disability under the Americans with Disabilities Act.  As such, although glaucoma is an impairment, Wyatt is not disabled within the meaning of the Act.

---

[7] Wyatt also contends that he cannot use the text messages option of a cell phone due to his inability to see the screen.  Wyatt Aff. at ¶ 9.  However, Wyatt does not indicate whether the use of a magnifying glass or other magnifying options could allow him to "text."  An individual's inability to see a cell phone screen in order to send a text message is insufficient alone to constitute a substantial limitation on the major life activity of seeing.

### b. Whether Wyatt is a Qualified Individual

MICA contends that even if Wyatt's glaucoma amounted to a disability under the Americans with Disabilities Act ("ADA"), summary judgment should be entered in its favor because Wyatt is not a qualified individual.  Specifically, MICA argues that mandatory overtime is an essential function of the Institutional Security Officer/Dispatcher ("ISO/Dispatcher") position and that despite reasonable accommodations Wyatt could not perform this obligation.

### 1. _Whether Wyatt Performed the Essential Functions of the ISO/Dispatcher Position._

Wyatt argues that the overtime requirement is not an essential function of the ISO/Dispatcher Position but rather a qualification standard.[8]  Pl.'s Resp. at 30.  He further argues that the mandatory overtime requirement was mandatory in name only because MICA referred to it as an "inconvenience," allowed employees to find suitable substitutes and authorized occasional reductions in personnel when substitutes were unavailable.  _Id._ at 33.

The essential functions of a job are the "fundamental job duties" of the position.  29 C.F.R. § 1630.2(n)(1).  A job function may be considered essential because, among other reasons, the position exists to perform that function, there are a limited number of

---

[8] "Qualification standards means the personal and professional attributes including the skill, experience, education, physical, medical, safety and other requirements established by a covered entity as requirements which an individual must meet in order to be eligible for the position held or desired." 29 C.F.R. § 1630.2(q). Under the ADA, employers are prohibited from "using qualification standards, employment tests or other selection criteria that screen out or tend to screen out an individual with a disability or a class of individuals with disabilities unless the standard, test or other selection criteria, as used by the covered entity, is shown to be job-related for the position in question and is consistent with business necessity." 42 U.S.C. § 12112(b)(6).

employees to whom that function can be assigned, or the function is so specialized that the employee was hired specifically to perform it.   29 C.F.R. § 1630.2(n)(2).   In determining which functions are essential, the ADA instructs that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job."   42 U.S.C. § 12111(8).

In this case, the MICA ISO/Dispatcher position description along with the Staff Handbook, the Campus Safety Operations Manual and personnel memoranda indicate that MICA considered mandatory overtime as an essential function of the ISO/Dispatcher position.   *See* Excerpts of MICA Policies, Def.'s MSJ, Ex. 2B, ECF No. 14-5.   The ISO/Dispatcher position explicitly required employees in that capacity to be "on-call" and "to work varied shifts including weekends, nights, and/or holidays."   *Id.*   Wyatt has also acknowledged as much in his deposition.   Wyatt Dep. at 45-48.   Moreover, MICA has indicated that the ISO/Dispatcher position is instrumental in providing for the safety and security of its community and property.   Def.'s Mot. Mem. in Supp. of Mot. for Summ. J. at 25, ECF No. 14-1 [hereinafter Def.'s MSJ Mem.]; *see also* Butkiewicz Aff. at ¶ 4, Def.'s MSJ, Ex. 2, ECF No. 14-3 [hereinafter Butkiewicz Aff.].   MICA has further asserted that "staffing the dispatch communications command center is a critical public safety function and must be performed twenty-four hours a day."   Def.'s MSJ Mem. at 25, ECF No. 14-1. Additionally, the record indicates that all ISO/Dispatchers were required to work overtime

shifts.  Def.'s MSJ Mem. at 26-27; Butkiewicz Aff. at ¶ 6; Wyatt Dep. at 95-96.

While Wyatt cites to the Campus Safety Full-Time Employee Operations Manual in an effort to support his contention that overtime was mandatory in name only, Wyatt in fact supports MICA's contention that overtime shifts are mandatory.  Pl.'s Resp. at 33.  In fact, the policy makes clear that MICA will only allow for shift substitutions "when in management's opinion adjustment to [an employee's] working schedule foes not place additional risk on the safety and security of the MICA community."  *Id.*  This demonstrates MICA's attempt at balancing the personal requirements of its employees with its own safety and security requirements.

Based on these facts, this Court is satisfied that MICA's concern for the safety and security of its community and property required the presence of round the clock security personnel.  The ISO/Dispatcher position was implemented to ensure the safety and security of the MICA campus as a whole.  Additionally, all ISO/Dispatchers were scheduled on a rotating basis to ensure their constant and uninterrupted presence on campus.  As such, it is clear that mandatory overtime is an essential function of the ISO/Dispatcher position.

    2.   *Whether Wyatt Received Reasonable Accommodations*

Wyatt contends that even where mandatory overtime is an essential function of the ISO/Dispatch position, he could perform all essential functions of the position with reasonable accommodations.  However, MICA allegedly failed to accommodate his disability by obligating him to work the 11:00 p.m. - 7:00 a.m. shift from May 2007 until his discharge despite his inability to drive at night.

In order to succeed on a failure to provide reasonable accommodations claim, a plaintiff must demonstrate that (1) the employer had notice of his disability, (2) he could perform the essential functions of the position with reasonable accommodations and (3) the employer refused to make reasonable accommodations. *See Rhoads v. FDIC*, 257 F.3d 373, 387 (4th Cir. 2001). It is undisputed that MICA had notice of Wyatt's condition and his need for an accommodation. *See Schneider v. Giant of Maryland,* LLC, 389 Fed. Appx. 263, 270 (4th Cir. 2010) (holding that the notice requirement is not 'onerous' but that an employer must be advised of both the disability and the derivative need for an accommodation). The issue here is whether Wyatt could perform the essential functions of the ISO/Dispatcher position with reasonable accommodations and whether MICA refused to provide such accommodations.

Under the ADA, an employer is required to make "reasonable accommodations" for the known physical or mental limitations of a qualified disabled individual, unless the accommodation would impose an undue hardship on the operation of the business. 42 U.S.C. § 12112(b)(5)(A). A reasonable accommodation may include "job restructuring, part-time or modified work schedule, reassignment to a vacant position, [and] acquisition or modification of equipment or devices." 42 U.S.C. § 12111(9)(B). Nevertheless, it is well established that the ADA does not require an employer to hire an additional person to perform an essential function of a disabled employee's position. *Lusby v. Metropolitan Wash. Airports Auth.*, 187 F.3d 630 (Table), 1999 WL 595355 at *16 (4th Cir. 1999); *see also* 29 C.F.R. Pt. 1630, App. at § 1630.2(o) ("An employer or other covered entity is not required to

18

reallocate essential functions."). A genuine issue of material fact exists if plaintiff shows that his proposed accommodation is feasible or plausible and if defendant is unable to demonstrate that the accommodation would create an undue hardship. *See U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002); *see also E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 314-15 (4th Cir. 2008).

In asserting that MICA failed to reasonably accommodate his disability, Wyatt argues that MICA could have either scheduled him for mandatory overtime during the day or alternatively reduced the number of employees working the overtime shift so as to allow him not to work at night. Pl.'s Resp. 36. However, MICA has established that having adequate security at all times of the day was necessary for the security and safety of its community and property. Def.'s MSJ Mem. at 25. Specifically, the record indicates that MICA's need for the remaining ISO/Dispatchers to work the 11:00 p.m. to 7:00 a.m. shift originated upon the termination of the ISO/Dispatcher employee permanently assigned to that shift. *See* Pl.'s Compl. at ¶ 11. Wyatt has also stated that this requirement would likely be a temporary situation until the position was once again filled. *Id.* Moreover, all the ISO/Dispatchers were asked to work that shift and received their assignment based on a "reverse seniority method." Def.'s MSJ Mem. at 27. Finally, MICA has established that it was obligated to schedule Wyatt for that shift as eliminating mandatory overtime only for him was "not operationally feasible" given the limited number of available employees. Def.'s MSJ Mem. at 31-32.

On another note, MICA and Wyatt agree that accommodations were made. MICA

allowed Wyatt to find volunteer substitutes to work his shifts on a number of occasions. *See e.g.* Pl.'s Resp. at 15;  Def.'s MSJ Mem. at 28.  Following the receipt of his medical diagnosis, MICA ensured that Wyatt would not be required to drive any of its vehicles at night. *See e.g.* Pl.'s Resp. at 13;  Def.'s MSJ Mem. at 6.  MICA even excused two of his absences which occurred between May and August 2007 and for which Wyatt was unable to find a replacement.  Pl.'s Resp. at 15-16.  MICA went so far as to brainstorm ideas concerning transportation methods to enable Wyatt to get to and from work.  *See* Pl.'s Resp. at 16-17; Def.'s MSJ Mem. at 10-13.  In sum, short of eliminating the overtime requirement for Wyatt, MICA sought to accommodate his disability in a number of ways.

Consequently, MICA did not fail to make reasonable accommodations to allow Wyatt to perform an essential function of his position.  Although both parties agree that Wyatt was capable of fulfilling his responsibilities once at work, because Wyatt continued to be unavailable for his overtime shift despite MICA's efforts at providing reasonable accommodations, he could not perform an essential function of his position.  Therefore, Wyatt has not presented sufficient evidence for a reasonable jury to conclude that he is a qualified individual with a disability under the ADA.  Therefore, MICA's Motion for Summary Judgment is GRANTED.

## II.   Whether Wyatt met MICA's Legitimate Expectations

Even if Wyatt was a qualified individual within the meaning of the ADA, summary judgment would still be entered in MICA's favor because Wyatt has not shown that he met MICA's legitimate expectations at the time of his termination.  In fact, Wyatt only argues

that he could perform all essential functions of the ISO/Dispatcher position.  The Fourth Circuit has directed that the inquiry into the 'legitimate expectations' factor is distinct from the inquiry into the 'essential functions of a job.'  *See Ennis v. Nat'l Ass'n of Bus. & Ed. Radio Inc.*, 53 F.3d 55, 61-62 (4th Cir. 1995).  In *Ennis*, the court reviewed the extensive evidence provided by the employer regarding the employee's job performance, such as annual performance evaluations, memoranda to the personnel file, and communications about her conduct, to conclude that she did not meet the employer's legitimate expectations.  *Id.*  The Fourth Circuit has also stated that "[i]t is the perception of the decision maker which is relevant, not the self-assessment of the plaintiff."  *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960-61 (4th Cir. 1996); *King v. Rumsfeld*, 328 F.3d 145, 149 (4th Cir. 2003); *DeJarnette v. Corning, Inc.*, 133 F.3d 293, 299 (4th Cir. 1998).

In this case, while both parties agree that Wyatt's performance on the job was satisfactory, MICA has demonstrated that Wyatt failed to satisfy one of its significant legitimate expectations.  Namely, MICA has explained that one of its expectations is for ISO/Dispatchers to be present during their shifts or to find a volunteer to replace them.  Def.'s MSJ Mem. at 38.  MICA has explained that this expectation stems from its need to have permanent security staff present to support the needs of its community.  Def.'s MSJ Mem at 25.  The parties agree that Wyatt was advised that he would face termination should he fail to report to his shifts or to secure a replacement volunteer.  *See e.g.* Pl.'s Resp. at 16-17; Def.'s MSJ Mem. at 38.  The record shows that, despite his knowledge of this requirement, Wyatt was not present during, nor did he find a replacement for, his September

21

22 and 23, 2007 shifts.  *See generally* Pl.'s Resp.; Def.'s MSJ Mem.  Therefore, there is no a genuine issue of material fact and reasonable trier of fact would be unable to find that Wyatt met MICA's legitimate expectations.  As such summary judgment should be entered in favor of MICA.

### III.    Whether Wyatt's Discharge Raises the Inference of Unlawful Discrimination

Even if Wyatt could prove that he was a qualified individual with a disability under the Americans with Disabilities Act and that his performance at the time of the discharge met MICA's legitimate expectations, MICA had a legitimate non-discriminatory reason for Wyatt's termination which does not raise an inference of unlawful discrimination.  To establish this element, the plaintiff is required to "present some other affirmative evidence that disability was a determining factor in the employer's decision."  *Ennis*, 53 F.3d at 59. This "burden is 'not onerous,' . . . , it is also not empty or perfunctory."  *Id.* (citing *Tx. Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).  "Plaintiff's evidence must be such that, if the trier of fact finds it credible, and the employer remains silent, the plaintiff would be entitled to judgment as a matter of law."  *Ennis*, 53 F.3d at 59.

Nevertheless, where the plaintiff establishes a *prima facie* case of disability discrimination, the defendant bears the burden to rebut the presumption of discrimination by providing a legitimate non-discriminatory reason for his action.  *See Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142 (2000); *Stokes v. Westinghouse Savannah River Co.*, 206 F.3d 420, 429 (4th Cir. 2000).  At that time, the burden shifts back to the plaintiff to "prove

by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Texas Dept. of Cmty Affairs v. Burdine*, 450 U.S. 248, 253 (1981). "The plaintiff always bears the ultimate burden of proving that the employer intentionally discriminated against [him]." *Evans v. Tech. Applications & Serv. Co.*, 80 F.3d 954, 959 (4th Cir. 1996) (citing *Burdine*, 450 U.S. at 253).

The Fourth Circuit has stated: "when an employer gives a legitimate, non-discriminatory reason for discharging the plaintiff, 'it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination.'" *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). A Court should not second-guess an employer's appraisal. *Hawkins*, 203 F.3d at 280. Rather, the Court's sole concern should be "whether the reason for which the defendant discharged the plaintiff was discriminatory." *Id.* (quoting *DeJarnette*, 133 F.3d at 299).

In this case, the evidence presented by Wyatt would not allow a reasonable trier of fact to conclude that he should be awarded judgment as a matter of law. *See Ennis*, 53 F.3d at 59. If anything, without the proof provided by MICA, his allegations lead to the reasonable inference that he may have been terminated for failing to report to his shifts. Additionally, MICA has presented sufficient evidence to establish that it had a legitimate, non-discriminatory reason to dismiss Wyatt. Specifically, MICA contends that Wyatt was terminated for failing to report for duty on September 22 and 23, 2007 and for failing to find a replacement for himself on those dates. As such, MICA has demonstrated that mandatory

23

overtime was necessary and in fact mandatory.  The evidence also shows that Wyatt knew of that requirement, knew to find a replacement should he not be able to report for duty and knew that sanctions, including termination, could be imposed should he fail to meet his obligation.  Wyatt Dep. at 48-49.  Moreover, the record indicates that Wyatt was aware that he would face termination should he not report for duty or find a replacement for the September 22 and 23 overtime shifts.  *See* Wyatt Dep. at 71-72, 74; Butkiewicz Aff. at ¶ 15. The parties also agree that Wyatt failed to report for duty on those dates and that he failed to find a replacement.  *See generally* Pl.'s Compl.; Def.'s MSJ Mem.  Additionally, the termination letter sent to Wyatt on September 26, 2007 explains that Wyatt was terminated because of these two absences.

This Court is therefore satisfied that MICA provided a legitimate, non-discriminatory reason for Wyatt's termination.   Furthermore, Wyatt has presented no evidence demonstrating that MICA's reason for terminating him was a pretext for discrimination. Thus, Wyatt has not presented sufficient evidence for a reasonable jury to conclude that he was dismissed because of his alleged disability or that MICA's reason for dismissing him was a pretext for discrimination.   As such, summary judgment should be entered in favor of MICA.

## IV.   <u>The May 25, 2007 Letter</u>

Wyatt attempts to attach great significance to the fact that a draft of a May 25, 2007 letter was initially sent to the Equal Employment Opportunity Commission ("EEOC") and that this draft was not identical to the final letter which he in fact received.  Pl.'s Resp. at 18;

24

*See also* 'Draft' Letter, Pl.'s Resp., Ex. 16, ECF No. 32 and 'Original' Letter, Pl.'s Resp., Ex. 9, ECF No. 25.   He specifically alleges that there is a genuine issue of material fact with respect to the copy of a May 25, 2007 letter which was produced by MICA during the Equal Employment Opportunity Commission's ("EEOC") investigation into his discrimination charge. *Id.*  He alleges that the copy of the letter produced to the EEOC differs in large part from the May 25, 2007 letter he received.  Pl.'s Resp. at 18.  Specifically, he claims that the copy produced was fabricated and was meant to mislead the EEOC in its investigation.  Pl.'s Resp. at 19.  In response to this accusation, MICA has simply noted that the copy produced to the EEOC was an earlier draft of the letter Wyatt received and that it was initially produced to the EEOC by mistake.  Def.'s Reply in Supp. of Summ. J. at 12, ECF No. 34. Moreover, the record reflects that upon learning of this issue, MICA promptly informed Wyatt of the mistake that had occurred.  *Id.* at 13.  MICA also does not dispute that the draft version was never sent to Wyatt.  *Id.*

A review of the draft letter and the final letter does not present any genuine issue of material fact which precludes the entry of summary judgment for the Defendant MICA in this case.  The draft and the final letter are essentially the same in content and reflect MICA's agreement to accommodate Wyatt's glaucoma to the extent possible.  Both the draft and the final letter inform Wyatt that he will not be required to drive MICA vehicles during evening hours but confirm that he is responsible for getting to and from work.  There is simply no issue of material fact concerning the initial draft and the final letter which precludes the entry of summary judgment for the Defendant in this case.

<u>CONCLUSION</u>

For the reasons stated above, Defendant Maryland Institute College of Art's Motion for Summary Judgment (ECF No. 14) is GRANTED.

A separate Order follows.

Dated:        March 7, 2012                    /s/_____
                                                                    Richard D. Bennett
                                                                    United States District Judge

26